(C.D. 4482)

A. N. DERINGER, INC. *v.* UNITED STATES

Court No. 71-12-02022

(Decided November 15, 1973)

*Barnes, Richardson & Colburn* (*Irving Levine* and *Joseph Schwartz* of counsel) for the plaintiff.

*Irving Jaffe*, Acting Assistant Attorney General (*John A. Gussow*, trial attorney), for the defendant.

RAO, Judge: The merchandise involved in this case consists of so-called "bra-kini" sets, manufactured by Philip Manufacturing Co. of Montreal, Canada, sold to Abraham & Straus and J.C. Penney Co., two department stores in the United States, and imported on June 9, 1970. It was assessed with duty under item 378.60, Tariff Schedules of the United States at 35 per centum ad valorem plus 25 cents per pound, as knit underwear, not ornamented, of man-made fibers. It is claimed that the brassiere portion should be classified separately under item 376.28 of said tariff schedules, as modified by Presidential Proclamation 3822, T.D. 68-9, at 20 per centum ad valorem, as brassieres, not ornamented.

The pertinent provisions of the tariff schedules, as modified, are as follows.

Classified under:

Schedule 3, part 6, subpart E

Subpart E headnote:

1. This subpart covers only underwear not specially provided for, of textile materials.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Other underwear, not ornamented:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Of man-made fibers:

378.60　　　　　　　　　　Knit _____25¢ per lb + 35% ad val.

Claimed under:

Schedule 3, part 6, subpart D

> Corsets, girdles, brassieres, and similar body-supporting garments for women and girls; * * * all the foregoing of any materials:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

376.28            Other articles, not ornamented__    20% ad val.

At the trial there were received in evidence samples of the merchandise in its condition as imported. (Collective exhibit 1.) The exhibit consists of four sets of brassieres and bikini panties, each set on a hanger. The brassiere and bikini portion of each set is made of the same material in the same colors and print design and with the same white elastic. The brassieres are in two styles, one with an elastic strap and the other with a built-up shoulder of elastic and fabric. Both the brassiere and the bikini are made of stretch nylon material, intended to fit all, or a number of, sizes. The brassieres are not structured, padded, or wired.

Mr. Moses Fine, president and general manager of the manufacturer, testified that the articles were not always sold in sets and recalled one instance of a sale of the brassieres and bikinis as separate items to Ohrbach's in New York. He had seen such or similar articles advertised for retail sale both in sets and separately and produced three newspaper clippings from 1971 and 1972. (Collective exhibit 2.) In those where the articles were offered separately, it is noted that the brassieres were available in different sizes, whereas the advertisement of a set indicated that one size would fit all.

There were also introduced into evidence three photographs taken at Ohrbach's, illustrating tables upon which brassieres and bikinis were placed for sale at a "Summer Clearaway." (Collective exhibit 3.) Both types of articles were displayed on the tables mixed together under signs stating, "Match-Them." Mr. Fine said that some of the merchandise was his and that the other articles shown were similar. The photographs are dated July 8, 1971.

Mr. Fine had also made a purchase of his own merchandise from Ohrbach's, buying two brassieres separately. Each had a separate sales tag and he received a separate sales slip for each. (Collective exhibit 4.) The sales slips are dated July 7, 1971.

The witness said that if one part or portion of the merchandise he sells were returned as defective, the other part would have commercial value. He would give credit on either part. It would be put back into commerce, provided he was 100 percent sure it had not been worn.

He offered and sold the brassieres separately to Ohrbach's. Bikinis are also sold separately. In the majority of cases, his firm sells the bras and bikinis together in sets. In fact, in exhibit 6, an affidavit of Mr. Fine executed subsequent to the trial, he stated that at or immediately prior to the date of exportation of this merchandise, his firm did not offer or sell bras such as or similar to those in the bra-kini sets for exportation to the United States.

Mr. Fine testified at the trial that the sets are imported on hangers which are designed to accommodate both the top and the bottom, although they could be used to display only one portion. He said the tops and bottoms were identical in the design of the fabric but were not necessarily meant to be worn together.

Miss Karen Mars, buyer of day-wear lingerie and sleepwear at Ohrbach's, testified that her firm sells bra and bikini sets of the same kind and class as the merchandise represented by collective exhibit 1 and has done so for about 3 years. These items are not always purchased and sold in sets. They are sometimes sold separately and are tagged and priced separately. When an item has been individually priced and is returned, credit is given for the individual item. In such cases the brassiere has a separate commercial value from the bikini.

She said that bras and bikinis are sometimes sold as a unit but they are not necessarily worn together. Collective exhibit B consists of bra-kini sets on hangers purchased at Ohrbach's as a unit. They have one price tag for the set. Each also has a tag stating, "Bra'n Bikini – Soft Natures Look – One Size Fits All." Miss Mars said they were invoiced as a set. She also said that one portion of the set could not be returned for credit.

Mrs. Caroline E. Cruys testified that she had purchased bras and bikinis separately on different days at Abraham & Straus and at Martin's. (Collective exhibit 5.) They have separate price tags and she received separate receipts. The bras and bikinis match, but the former are sized brassieres, which are padded and wired. Mrs. Cruys said she has seen merchandise like collective exhibit 1 sold in Abraham & Straus on separate hangers, hung on different bars, but had not seen the bras and bikinis on a single hanger together. In her opinion, it was not necessary to wear a matching bra and bikini together.

Defendant called John A. Mahoney, brassiere buyer for J. C. Penney Co. He had purchased bra-kini sets, such as collective exhibit 1, for retail in Penney stores. They were purchased at a single unit price and were sold at retail at a single unit price.

There was received in evidence an information sheet on bra and bikini sets which was distributed to Penney stores for use in ordering merchandise. (Exhibit C.) Philip Manufacturing Co. is listed as the vendor. The merchandise is described as "100% Stretch Nylon Print Bra and Bikini Set" and it is stated that one size fits 32–38 hips and

A–B bra cup. On the back under "Merchandising," it is further stated: "The idea of coordinating a soft bra and bikini and selling them together on a hanger has proven to be tremendously successful."

Mr. Mahoney said that the bra-kini, embracing a one-size concept, "is packaged as a single unit on the hanger for the expressed intent of selling the single unit." It has a higher unit value for the retailer and satisfies consumer wants, such as a styling preference. This type of coordinated merchandise with the one-size unconstructed bra appeals to women with smaller figures.

According to the witness, such sets are never broken down and the items sold separately in the normal course of Penney operations. A purchaser could not return the brassiere portion alone for credit. He said that Penney sells bras alone and bikinis alone, but when bra-kini sets are retailed, a customer would have to buy two sets if she wanted to make new combinations.

Mr. Mahoney testified that there is a difference between a one-size-fit-all garment and brassieres which are sized in the way the garment functions. Sized brassieres do not lend themselves to use in a bra-kini set. The one-size concept has served to reduce the retailer's stock-keeping units, thereby giving him the ability to turn over merchandise much faster.

Morris Kornblatt, vice-president of marketing management for Maidenform, testified that his firm produces merchandise similar to collective exhibit 1, a sample of which was introduced into evidence as collective exhibit E. It consists of three bra and bikini sets with hangers, boxed together. The articles are similar to those in collective exhibit 1, except that they are in a solid color rather than a print design. An invoice reflecting a sale from Maidenform to Penney of such merchandise was received in evidence as exhibit F. The witness said the price thereon was the price per set.

According to the witness, the bra-kini set satisfies customer demand for some sort of coordinated dressing in underclothes, similar to that in outer clothing.

He said the merchandise in the Maidenform advertisement, exhibit 2–B, included a sized brassiere, which matched the bikini in color and fabric. It would be purchased to wear as undergarments and could be switched with other tops or bottoms.

Miss Norma Reinhart, bra and girdle buyer at Abraham & Straus, testified that she was familiar with merchandise like collective exhibit 1 and produced a sample which was received in evidence as exhibit G. It is a bra-kini set made of stretch nylon lace with elastic trim. She said it is called in the trade, one-size-fits-all, which really means 32 to 36, A and B cup. Both the top and bottom match in color and the trim is matching. It comes in on a hanger, is marked "Set," and has a ticket on it that says "$3.00." It was priced as a unit and retailed

as a unit. One portion could not be returned for credit without the other. The unit is the set and neither piece has a value to the store separately.

As a buyer, she purchases the sets because there is a customer demand for them. Young people like the fact that they can run into the store and purchase something that matches without spending a lot of time. She said the bra-kini set reached the height of its development in 1970–71. To counter publicity about bra burning, her firm and other stores attempted to turn a negative reaction into a positive feeling about bras. The soft tricot type bra and the stretch bra were promoted as the no-bra look and young people and those with young figures responded. The sets filled the needs of the customers. The sets in collective exhibit 1 and exhibit G represent the so-called no-bra look.

She has never purchased the set at one time and the bra and bikini separately at other times from the same manufacturer. She has purchased similar merchandise separately and sold it separately. She sells bras and bikinis which match as separate items.

Miss Kathleen Kordowski testified that she is familiar with merchandise such as collective exhibit 1 because she wears that type of garment and has gone shopping for it. She produced articles which she had purchased at Woolworth's and described them as a green and white bra and matching bikini panty, stretch elastic, one-size-fits-all. They were sold on the hanger. (Exhibit H.) She subsequently attempted to return the bra portion but the salesgirl would not accept it. She could have purchased bras and bikinis separately at Woolworth's but not the same type.

Mrs. Linda Eisen testified that she was wearing garments such as those in collective exhibit 1, which she described as white and yellow check with a little bow in the front of the bra, matching, stretch, one-size-fits-all. She did not think, however, that they would fit the fuller figure because there was no support in the bras; their purpose was to be free flowing. She has other matching sets of the same kind, all of the no-bra style. She buys them because they are attractive and comfortable, and match. Since they match, she wears them together. She has attempted to purchase one component of a bra-kini set separately but was told that she had to buy both together. She has purchased such sets at Macy's, J. C. Penney's, and Ohrbach's. The merchandise from Macy's was received as exhibit I; that from Ohrbach's is represented by collective exhibit B, and that from Penney as exhibit J. They were displayed in the stores on hangers; both the bra and bikini panties were on the same hanger, and the hangers were hanging on racks. The sets were priced with one ticket. She had never seen any no-bra brassieres sold separately from the panties. She had seen other kinds of constructed bras sold separately. She

always wears both parts of the set. She did not wear the panties without wearing the bra.

This case presents again the ever-difficult problem of whether or not particular merchandise, consisting of two or more components, is classifiable as an entirety for tariff purposes. While analogies are often difficult to find and their application uncertain because of variances in pertinent factors (*Charles Garcia & Co., Inc.* v. *United States*, 45 CCPA 1, 2, C.A.D. 663 (1957)), two recent cases involve fact situations which closely resemble that in the present action. *Miniature Fashions, Inc.* v. *United States*, 54 CCPA 11, C.A.D. 894 (1966), and *The Nissho American Corp.* v. *United States*, 64 Cust. Ct. 378, C.D. 4005 (1970), appeal dismissed 57 CCPA 141 (1970).

In *Miniature Fashions*, the merchandise consisted of so-called "cabana sets," described by this court as "two-piece shirt-short sets." The shorts were classified as articles of wearing apparel and the shirts as shirts. The importer claimed they were entireties classifiable as wearing apparel. It appeared from the evidence that the items were designed as a unit, matched as to color, print, and fabric; imported as a unit, pinned together; invoiced as a unit; and invariably sold as a unit, both at wholesale and at retail. If one part were damaged, the entire set would be returned for credit or replacement. One part could not be sold separately. There was also evidence that because of recent fashion trends, garments such as those in issue were created to perform a dual function, first, to clothe the child, and second, to do it in an eye-pleasing manner. The court, after discussing many cases involving entireties, stated (p. 16):

> From the authorities discussed in the opinion below and the arguments presented here, it is apparent that the doctrine of entireties is to be used as an aid to ascertain proper classification. Where Congress has not created an express classification to govern, the problem is one of ascertaining the most suitable classification. The result reached in *Lang* [*Lang Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 341, T.D. 42495 (1927)] appears to place the doctrine of entireties in its proper perspective. Thus, whatever criteria from the doctrine of entireties is applied, e.g., "function," "use," "individual entities," "newly created entity," "intent," "design" or "commercial unit," such criteria may not circumvent the intent of Congress.

The court noted that the doctrine of entireties could lead to contrary conclusions depending on what criteria were given controlling effect. It pointed out that classification is determined by the condition of the articles at the time of importation, and held, in view of the facts mentioned above, that the cabana sets were entireties, regardless of the fact that someone might wear but one portion or wear a part in combination with another article. The court concluded (p. 18):

\* \* \* We think the evidence establishes that the upper portions of the cabana sets are not the "shirts" on which Congress has fixed a duty of 25% ad val. Appellant has imported what has been designed and sold exclusively as a unit. The upper portion, from the evidence of record, has no commercial value when returned. The upper portions are not imported as separate shirts. In view of the evidence we think the upper portion of the imported sets is more properly classified under paragraph 919 as part of an entirety of clothing rather than as a shirt under the same paragraph. We do not find this to be contrary to the considerations given effect in *Lang*, supra.

In *The Nissho American Corp.* v. *United States, supra,* the merchandise consisted of cotton flannel shirts and corduroy pants, called shirt and longie sets. The pants were lined with the same plaid material as the shirt and the pocket was trimmed with the same material. The court noted (pp. 381–382) :

The record thus establishes that the shirt and longie set herein was designed, purchased, imported, and invoiced as a unit. The two pieces were matched as to color, print and fabric. The merchandise was advertised to retail customers as a set and was so sold both at wholesale and at retail. It was never broken up and the items sold separately. If returned by a customer, it would be resold as a set or if defective, destroyed or given to charity. While the shirt portion is a shirt and the trouser portion trousers and the ultimate consumer may use them separately with other trousers or slacks, it is clear that they were designed and merchandised as a set to be worn together.

On the authority of *Miniature Fashions, Inc.* v. *United States, supra,* the court held that the merchandise was classifiable as an entirety. Referring to defendant's attempt to distinguish that case, the court said (p. 383) :

Defendant attempts to distinguish this case alleging that the items comprising the shirt and longie set have a commercial reality, existence and value separate and apart from each other and are so bought and sold. The record, however, establishes no more than that there are shirts and trousers, of a better quality, which are bought and sold separately and that each article in the set has a separate intrinsic value. It is clear that the articles herein were not in fact marketed separately, and that they have no commercial value except as a set.

Plaintiff in the instant case has cited many other decisions on entireties, relying especially upon *Lang Co. et al.* v. *United States,* 15 Ct. Cust. Appls. 341, T.D. 42495 (1927), and *United States* v. *Altray Company,* 54 CCPA 107, C.A.D. 919 (1967).

In the *Lang* case, the court held that a tablecloth and accompanying napkins did not constitute an entirety on the ground that each was complete without the other and that there was an *eo nomine* provision for napkins. Our appellate court in *Miniature Fashions, Inc.* v. *United*

*States, supra,* did not find this case a bar to holding that cabana sets were an entirety.

The merchandise in the *Altray* case consisted of a miniature artificial Christmas tree with a foil-wrapped chocolate wafer attached to the base of the tree. It was held that it was not an entirety on the ground that its design contemplated its disassembly and utilization separately, the tree to be used as a like article purchased separately and the wafer to be eaten. The facts in the instant case are not analogous: the articles were designed to be used and were used together as a set, both as wearing apparel and not for unrelated purposes.

Plaintiff attempts to distinguish *Miniature Fashions, Inc.* v. *United States, supra,* and *The Nissho American Corp.* v. *United States, supra,* on the ground that there is an *eo nomine* provision for brassieres and that Congress intended to provide for all such garments in that provision; that bras and bikinis of the type in the sets were not always imported and sold as sets; that each component has a separate commercial value; that each has its own particular purpose and function, and that the personal taste of the wearer is a factor which should be given some consideration and weight.

In both *Miniature Fashions* and *Nissho American,* there was an *eo nomine* provision for shirts, but the courts did not consider that determinative of a Congressional intent to classify the shirt portion of the sets separately. In *Miniature Fashions,* the court found that the evidence established that the upper portions of the cabana sets were not the "shirts" which Congress had provided for. Likewise, the record here establishes that the upper portions of the bra-kini sets are not the "brassieres, and similar body-supporting garments" intended by Congress to be classified under item 376.28, *supra.* The bras in the sets were of the so-called no-bra type, which were unstructured and were designed to be free flowing rather than to give support. The evidence that such bras were sold separately is very meager. At wholesale, Mr. Fine recalled one sale to Ohrbach's. He purchased two such bras separately at Ohrbach's and offered photographs of such items being sold separately at a clearance sale, on or about the date of his purchase. Otherwise, it would appear that the bras sold separately were padded and wired and that the instant type was sold only as part of a bra-kini set.

While there is some evidence that the manufacturer would have given credit for one portion if returned separately and that some stores would do so when the article was sold separately, the weight of the evidence indicates that when the articles were sold as a set, they had to be returned as a set. One witness testified that one portion alone had no value to the store.

While each part of the set had a particular purpose and function as wearing apparel, the articles were designed to be worn together and were sold in sets to satisfy a consumer demand for some sort of coordi-

nated dressing in underclothing. It is obvious that the customer could wear each part separately or with other articles of wearing apparel but they were not designed for that purpose, and, according to the weight of the evidence, were not ordinarily so used.

The bras and bikinis were not only sold at wholesale in sets, but a hanger was included with each set, so that the articles might be displayed together. They were so displayed and the retail customer in most cases also received the hanger.

It is clear from the record that bra-kini sets are a commercial entity designed to satisfy a particular consumer demand and that they had a higher unit value for the retailer and allowed for faster turnover of merchandise. The problem of whether particular merchandise is an entirety or not must be examined from the standpoint of the actual nature of the article of commerce in its imported condition and the commercial realities associated therewith, provided the intent of Congress is not circumvented. *Donalds Ltd., Inc.* v. *United States*, 32 Cust. Ct. 310, 314, C.D. 1619 (1954) ; *Ikora, Inc.* v. *United States*, 66 Cust. Ct. 262, 270, C.D. 4202, 325 F. Supp. 905 (1971).

The merchandise in the instant case in its imported condition is an article of commerce, known and sold as bra-kini sets. For the reasons stated and on the authority of *Miniature Fashions, Inc.* v. *United States, supra*, I hold that it was properly classed as an entirety. I find the cited case indistinguishable.

In view of plaintiff's claim that the merchandise is not an entirety but should have been appraised and classified as two separate articles, plaintiff has presented evidence as to the separate dutiable values of the bra and bikini components, in the form of an affidavit of Mr. Fine. Defendant has introduced no contradictory evidence, but claims plaintiff has not met its burden of proof on the issue. It does not waive the jurisdictional objections raised in a motion to dismiss which was denied on February 13, 1973. *A. N. Deringer, Inc.* v. *United States*, 70 Cust. Ct. 337, C.R.D. 73–4 (1973).

Since plaintiff has failed to establish that the merchandise is not an entirety, it is unnecessary to consider the valuation issue.

The action is dismissed. Judgment will be rendered accordingly.