(C.D. 4671)

J. C. Penney Purchasing Corporation *v.* United States

Court No. 74-3-00848

Port of San Francisco

(Decided November 2, 1976)

*John B. Pellegrini* for the plaintiff.
Rex E. Lee, Assistant Attorney General (*Velta A. Melnbrencis,* trial attorney), for the defendant.

MALETZ, Judge: This case involves ladies wearing apparel invoiced as "Ladies knit suits" which consists of three components:

a jacket, a shell (sweater) and a pair of pants. The importations, which were in two distinct styles, identified as style 200 and style 7205, were entered at the port of San Francisco in September 1973.

At liquidation, each of the three components was appraised and classified by the government as a separate article.[1] In this connection, all the jackets were classified under item 791.75 of the Tariff Schedules of the United States, as modified by T.D. 68–9, as wearing apparel of leather, not specially provided for, and assessed duty at the rate of 6 percent ad valorem. The shells and pants were classified under item 382.58, as modified by T.D. 68–9, as other women's wearing apparel, not ornamented, of wool, knit, and assessed duty at the rate of 37.5 cents per pound plus 20 percent ad valorem.

Plaintiff claims the three articles (jackets, shells and pants) forming style 200 "suits" as well as the three articles forming style 7205 "suits" are entireties in chief value of leather and therefore properly classifiable under item 791.75 as wearing apparel of leather dutiable at the rate of 6 percent ad valorem.

Against this background, two issues are presented. The first is whether the importations are entireties for tariff purposes. Second, if the articles are held to be entireties, the court must then determine the component material of chief value since the claimed provision, item 791.75, is a chief value provision.

The pertinent provisions of the Tariff Schedules of the United States are as follows:

GENERAL HEADNOTES AND RULES OF INTERPRETATION

\* \* \* \* \* \* \*

9. Definitions. For the purposes of the schedules, unless the context otherwise requires—

\* \* \* \* \* \* \*

(f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an article and a material (e.g., "furniture of wood", "woven fabrics, wholly of cotton", etc.), have the following meanings:
(i) "of" means that the article is wholly or in chief value of the named material;

\* \* \* \* \* \* \*

---

[1] The question of the proper appraised values is not presently before the court since this issue has been severed. See *Pretrial Memorandum*, Oct. 9, 1975.

SCHEDULE 3. – TEXTILE FIBERS AND TEXTILE PRODUCTS

\* \* \* \* \* \* \*

PART 6. – WEARING APPAREL AND ACCESSORIES

\* \* \* \* \* \* \*

Subpart F. – Other Wearing Apparel

Subpart F headnote:

1. This subpart covers only wearing apparel, not specially provided for, of textile materials.

\* \* \* \* \* \* \*

Other women's, girls', or infants' wearing apparel, not ornamented:

\* \* \* \* \* \* \*

Of wool:
 Knit:

\* \* \* \* \* \* \*

 Other:

\* \* \* \* \* \* \*

 Valued over $5 per pound:

\* \* \* \* \* \* \*

382.58 Other_____ 37.5¢ per lb. + 20% ad val.

SCHEDULE 7. – SPECIFIED PRODUCTS; MISCELLANEOUS ᐧAND NON-ENUMERATED PRODUCTS

\* \* \* \* \* \* \*

PART 13. – PRODUCTS NOT ELSEWHERE ENUMERATED

\* \* \* \* \* \* \*

Subpart B. – Articles of Fur and of Leather
Subpart B headnote:

1. For the purposes of the tariff schedules (except part 5A of schedule 1)—
(a) the term "leather" includes "leather", as defined in headnote 1(a), part 5A, schedule 1, and also includes rawhide, parchment, and vellum.[2]

\* \* \* \* \* \* \*

---

[2] Headnote 1(a), part 5A, schedule 1, reads:
1. For the purposes of this subpart —
(a) the term "leather" covers leathers made from hides and skins of all animals (including birds and fish); \* \* \*

Wearing apparel not specially provided
for, of leather:

\* \* \* \* \* \* \*

791.75 Other_____ 6% ad val.

A representative sample of style 200 (plaintiff's exhibit 3) demonstrates that it consists of a lined rust-colored pigskin suede blazer jacket with contrasting beige-colored piping. The piping outlines the collar, the buttonholes, the tabs on the sleeves, and forms a "T" design on the patch pockets. The jacket also has a double row of decorative beige saddle stitching which extends around the perimeter, down the outer seam of the sleeves and around the two patch pockets and a breast pocket. The shell is a mock-turtle one made of ribbed wool, while the pants are cuffed and bell-bottomed and made of a flat wool knit weave. Both the shell and the pants are dyed to match the piping and stitching on the jacket.[3]

Style 7205 (plaintiff's exhibit 4) consists of a blue wool knit shirt-type jacket with matching blue lamb-suede. This lamb-suede is used to form: two front panels each of which has two flap pockets; a yoke in the back; a button-down wrist tab; and a buckle-belt. The shell and the pants are dyed to match the jacket and are of the same style as the shell and pants of style 200.[4]

At the trial plaintiff called four witnesses [5] and offered eight exhibits in evidence. The defendant did not call any witness but offered eight exhibits in evidence.

## The Entireties Question

With respect to the issue of entireties, the following facts appear: In June 1973, the plaintiff J. C. Penney Purchasing Corp. entered into two contracts with the Fortune Knitting Factory of Hong Kong (hereafter referred to as "Fortune"). The first contract provided for the sale of (1) 4,000 sets of style 200 suits, which were referred to as "Ladies' 3-pce. pig skin blazer woolen pants suit," at the unit price of $38.00 per set and (2) 2,800 sets of style 7205 suits, which were referred to as "Ladies' 3-pce. suede trim jacket pants suit," at the unit price of $28.00. The second contract provided for the sale of 1,000 sets of style 200, which were referred to as "Ladies' 3-pce. pig skin blazer woolen pants suit," at the unit price of $39.00 per set. Both contracts provided for color and size distribution, quality controls, labelling, shipping and invoicing.

---

[3] Style 200 also comes in a navy jacket with red trim, a red shell and red pants, and a brown jacket with matching camel-colored trim, shell and pants.

[4] Style 7205 also comes in beige, loden green and rust.

[5] Three of the four witnesses were employed by the J. C. Penney Company, Inc. as buyers, directors or advisers in the field of ladies fashion apparel.

The packing instructions in both contracts required "[e]ach set to be flat packed in heavy polybag and 24–30 sets in a seaworthy shipper." In accordance with these instructions, each of the imported three-piece "sets," consisting of a matching jacket, shell and pants, was shipped as a single unit in a heavy polybag envelope.

Both style 200 and style 7205 were designed by Penney's ladies suit buyer. The genesis of style 200 was a pigskin blazer jacket which was sold as a separate item of apparel at the Saks Fifth Avenue department store in New York City. The Penney buyer sent a sample of this blazer to its manufacturer, Fortune, with instructions to modify the design of the jacket by adding contrasting piping, saddle stitching and buttons, and to coordinate the trim on the jacket with a sleeveless turtleneck shell (sweater) and a pair of slacks all made to prescribed specifications. The colors on the shell and slacks were to be dyed to match the trim of the jacket thereby coordinating the unit as a three-piece suit.

The genesis of style 7205 was a two-piece wool knit pant suit with a suede front which was purchased by a Penney buyer at the Franklin Simon department store in New York City. The sample was sent to Fortune with instructions to produce the suit as a three-piece pant suit by adding a wool shell or sweater. The wool in the jacket, sweater and pants was to be dyed in the same lot and vat, while the suede was also to be dyed to match.

The Penney retail price for style 200 was $89.00, while style 7205 retailed for $65.00. Both three-piece styles had to be ordered and reordered as a unit by the individual Penney store. The component parts of these sets were never intermingled with any garments sold as separates or coordinates in the Penney stores. Furthermore the policy of the Penney company required that these garments be sold as units, that is a size 14 jacket had to be sold with a size 14 shell and pants. Thus, if a customer came in with a size problem—i.e., requiring a size 14 jacket or shell with a size 16 pants—the store was not allowed to break up the set to fit the customer. This policy—that the set must be sold as an entirety—was never violated.

In those instances when a Penney store had not sold its entire stock of the imported pant suits and there were leftovers, it reduced the price. If the suits did not sell at the reduced price, the store manager asked for permission from the Penney buyer to return the leftover suits to New York. If a set had a defect in the jacket, shell or pants, the normal practice was for the store to return the entire set to New York or to Penney's Buena Park warehouse in California. If the defect was minor, it was repaired and the set was sold as a unit in Penney's retail associate store in New York City. Otherwise, defective returned sets were disposed of by salvage or donated to churches or charities.

The imported sets were advertised as suits. In the Penney stores, they were displayed on a circular rack or a T-stand and were offered for sale assembled on one hanger as a three-piece set and priced as a three-piece set.

The record indicates that a ladies suit, including a pant suit, is a garment designed as "a multi-piece woman's apparel sold as a unit with a common size"; it is a preconceived outfit which consists of two or three or more components of the same size which are always sold as a unit.

In contrast to suits, coordinates are separate items that can be mixed and matched and worn together. Coordinates are preconceived as to style and color and present a multiple of coordinated choices for the wearer. However, since coordinates are separates, each component can be purchased in a different size.

Unlike coordinates, the imports were already fully coordinated; in other words, in the case of the suits, the decision has been made for the consumer who needed only select her color and her size without going to the trouble of shopping around to find separate components to make a coordinated outfit.

The importations were purchased by the ladies suit buyer who was in charge of subdivision 265 at Penney. The buyer in this subdivision does not have the authority to buy these components as individual articles; rather, his jurisdiction is limited to buying and selling sets only.

It is to be added that sweaters and pants identical or substantially similar to those used in the imported sets could have been purchased as separates at other stores in the United States during the years 1973 through 1975.

With these facts in mind, we now consider whether the importations are entireties for tariff purposes. The question as to whether two or more components shipped together are to be considered an entirety for tariff purposes and thus assessed duty as one complete article is one that is "fraught with much difficulty." Sturm, *A Manual of Customs Law* (1974) p. 289. The extent of these difficulties was expressed in *Charles Garcia & Co., Inc.* v. *United States*, 45 CCPA 1, 2, C.A.D. 663 (1957) as follows:

> Because of the different situations which are encountered involving the scope of individual tariff terms, meanings of particular words, evidences of legislative intent, and the existence of administrative practice and prior judical decisions, analogies are not only difficult to find in the field of entireties, but are of uncertain reliance in view of the variances which may be encountered in the factors mentioned.

In general, an article is regarded as an entirety when the joined components form a new article which possesses a character or use

different from that of any of its parts, or when one of the elements of the component is predominant, the other parts being merely incidental to the predominant part. See Sturm, *id.* at 288.

Such rules notwithstanding, the determination of an entireties issue presents many problems as pointed out by the court in *Miniature Fashions, Inc.* v. *United States*, 54 CCPA 11, 15, C.A.D. 894 (1966):

> The difficulty which is experienced in this type of case is not so much the formulation of a workable rule as it is the application of the provisions thereof to a given factual situation. Where it is apparent that the components of an importation have no useful function until joined into a single entity, it is, course, relatively easy to say that the result constitutes an entirety. Where, however, the several components of a unit are to any extent alone susceptible to a separate use, the question of whether their individual identities are subordinated to the newly created entity is not so readily answered.

In determining whether an importation is an entirety the actual nature of the imported commercial entity must be the determining factor. As our appellate court noted in *Altman & Co.* v. *United States*, 13 Ct. Cust. Appls. 315, 318, T.D. 41232 (1925):

> * * * [I]f an importer brings into the country, at the same time, certain parts, which are designed to form, when joined or attached together, a complete article of commerce, and when it is further shown that the importer intends to so use them, these parts will be considered for tariff purposes as entireties, even though they may be unattached or inclosed in separate packages, and *even though said parts might have a commercial value and besalable separately.* [Emphasis added.]

More specifically, so far as the present case is concerned, recent decisions have held that multiple components of wearing apparel were entireties for tariff purposes when certain guidelines or criteria were satisfied. Thus, in *Miniature Fashions, Inc.* v. *United States, supra,* 54 CCPA 11, the court held that certain cabana sets which consisted of shirts and shorts were entireties. In so holding the court noted the following: the sets were designed as a unit; they were matched as to, color, print and fabric; they were imported as a unit; they were, pinned together; they were invoiced as a unit; they were sold as a unit; the individual components of the set had no commercial value except as part of a unit; and individual components of the set were not resold as individual articles.

To similar effect is the decision in *The Nissho American Corp.* v. *United States*, 64 Cust. Ct. 378, C.D. 4005 (1970), *appeal dismissed,* 57 CCPA 141 (1970) which concerned the question as to whether boys, flannel shirts and corduroy pants called shirt and longie sets were entireties. The court held that the shirts and pants were entireties, stating (64 Cust. Ct. at 381–82):

The record thus establishes that the shirt and longie set herein was designed, purchased, imported, and invoiced as a unit. The two pieces were matched as to color, print and fabric. The merchandise was advertised to retail customers as a set and was so sold both at wholesale and at retail. It was never broken up and the items sold separately. If returned by a customer, it would be resold as a set or if defective, destroyed or given to charity. *While the shirt portion is a shirt and the trouser portion trousers and the ultimate consumer may use them separately with other trousers or slacks, it is clear that they were designed and merchandised as a set to be worn together.* [Emphasis added.]

Also, in *A. N. Deringer, Inc.* v. *United States*, 71 Cust. Ct. 103, C.D. 4482 (1973) the court found that certain "bra-kini" sets consisting of a brassiere and bikini pants were entireties. In reaching this conclusion, the court considered the following factors determinative: the articles were designed to be worn together; they were sold in sets; and they were displayed in sets. See also *W. T. Grant Co.* v. *United States, 74* Cust. Ct. 3, C.D. 4579 (1975).

Turning now to the present case, an examination of plaintiff's exhibits 3 and 4 clearly reveals that the components of both of the imported pant suits are coordinated in a manner which creates a complete outfit. With respect to style 7205, plaintiff's exhibit 4, the three components of the suit are the same color, care having been taken to match the color of the leather and wool materials and each item incorporates a wool knit fabric. In style 200, plaintiff's exhibit 3, the color of the piping, trim, and buttons of the jacket, all of leather, match the color of the knitted shell and pant components. Again, special care was taken to ensure that the color match was as close as possible.

The purchase contracts covering the merchandise at issue clearly demonstrate that the suits were purchased by plaintiff as sets.

The official papers show that the imported suits were invoiced, packed and imported as sets. In fact the only reason the invoices listed separate values was to satisfy a request of the Customs Service. The testimony shows that the suits were packed as sets; this is corroborated by the representative polybags in which the subject pant suits were shipped as a unit as required by the sales contract.

As we have seen, style 200 was advertised as a set and both styles 200 and 7205 were sold at retail as sets. The suits were not broken up to accommodate a customer with a size problem and they were displayed in the retail stores as sets. The record also demonstrates that those of the imported suits which were not salable because of defects in one or more of their components were returned as sets and were not broken up and sold as separate articles.

The testimony shows further that the jacket in style 200 and the shells and pants in both pant sets could be worn individually or in combination with other articles and that articles of wearing apparel

similar to the components of the subject suits are sold separately. This, however, does not preclude the imported articles from being classified as entireties. As the court made clear in the *Altman* case, *supra*, 13 Ct. Cust. Appls. at 318, an article may be an entirety "even though * * * [the] parts might have a commercial value and be salable separately." Likewise in *Nissho American*, *supra*, this court held that the sets therein involved were entireties even though the ultimate consumer may use components of the shirt and longie sets separately with other trousers or slacks (64 Cust. Ct. at 382) and "even though it is possible to wear the items separately." *Id.* at 383.

In summary, it is noted that the subject suits were designed, purchased, imported and invoiced as a unit. The three pieces were coordinated or matched as to color and matched as to size. The merchandise was advertised to retail customers as a set and was so sold at retail. It was never broken up and the items sold separately. If returned by a store, it would be resold as a set, or if defective, disposed of by salvage or donated to a church or charity. In light of the above, it must be concluded that the imported suits are entireties for tariff purposes.

The defendant has cited an exhaustive list of cases to establish its contention that the importations are not entireties; however, only one such case deals with wearing apparel. In that case, *United States* v. *Schoen & Co., Inc.*, 20 CCPA 370, T.D. 46133 (1933), certain embroidered blouses and certain silk skirts, which were matched in color but were not designed to form a complete article of commerce, were not used as such by the importer, were separately invoiced and were offered for sale separately, were held dutiable by the court under the separate provisions of law applicable to each article rather than as entireties.

The present case, however, is clearly distinguished from *Schoen* upon its facts since the imported jackets, shells and pants were designed, invoiced, and offered for sale as a unit or one complete article of commerce thus putting it squarely in point with the previously cited *Miniature Fashions*, *Nissho American*, *A. N. Deringer*, and *W. T. Grant* cases.

Defendant further contends that since the duty on wearing apparel of man-made fibers and wool is higher than the rate on wearing apparel made of other materials it would circumvent the intent of Congress to have the shells and slacks which are wool wearing apparel reliquidated as wearing apparel of leather. In this case, however, we find the converse to be true since it was the intent of Congress to create a separate classification for leather wearing apparel. Thus a three-piece suit, meeting the criteria for an entirety, comprised of wool and leather, but in chief value of leather, must be classified as leather wearing apparel. Indeed, it would be inconsistent with the

intent of Congress to classify it otherwise. See *Miniature Fashions, Inc.* v. *United States, supra,* 54 CCPA at 18.

In view of all these considerations, we find that the importations are entireties and turn our attention to the remaining issue of the component material of chief value.

### Component Material of Chief Value

Inasmuch as General Headnotes and Rules of Interpretation, headnote 9(f)(i) states that the term "of" when used between the description of an article and a material means that the article is wholly or in chief value of the named material, it was plaintiff's burden, in order to establish its claim under item 791.75, to prove that the component material of chief value of the imported suits is leather. See *A. N. Deringer, Inc.* v. *United States,* 59 Cust. Ct. 148, C.D. 3101, 272 F. Supp. 987 (1967); *Broadway-Hale Stores, Inc.* v. *United States,* 63 Cust. Ct. 194, 198, C.D. 3896 (1969).

The proper method of determining the chief value of these importations is to ascertain the costs of the separate component materials at the time when they have reached the state when nothing further need be done to them except combine them into the completed article. *United States* v. *Jovita Perez,* 44 CCPA 35, 39, C.A.D. 633 (1957).

In computing the component material of chief value, labor performed on the individual component materials prior to combination into the completed article is considered as part of the component's value. *Pico Novelty Co., Inc.* v. *United States,* 62 Cust. Ct. 341, 344, C.D. 3759 (1969). Further, the costs of any processing done on component materials to permit their uniting with other materials in manufacturing an article are attributable to the material and must be considered in determining the component material of chief value. However, costs incurred in uniting the materials into the finished article are not considered in the chief value computation. *Swiss Manufactures Association, Inc.* v. *United States,* 39 Cust. Ct. 227, 233, C.D. 1933 (1957), *appeal dismissed,* 45 CCPA 129 (1958).

An examination of the samples makes it clear that leather and wool are the only possible components of chief value.[6] In this setting, plaintiff presented the testimony of V. L. Chen, the manager and a partner of Fortune, the manufacturer of the importations, to establish that leather was the component material of chief value for the imported suits. Chen testified that he was personally familiar with the costs of the various materials for styles 200 and 7205 since he was responsible for purchasing the materials that went into their production. He also testified that he was personally familiar with the type and quantity of the materials used in their production and with the processing and processing costs of these materials. Further,

---

[6] It is obvious that the other materials such as button blanks, rayon interlining, cotton thread and zippers would not be of such value as to be the component material of chief value.

Chen testified that under his supervision a cost breakdown for styles 200 and 7205 was prepared by the firm's accountant in 1974 from Fortune's manufacturing and purchasing records covering May and June 1973 when the materials for the importations were purchased.[7] This cost breakdown is included in evidence as plaintiff's exhibit 7. Chen stated that he personally verified the data in plaintiff's exhibit 7 against the data in Fortune's books and records and that the records which formed the basis for this exhibit were prepared in the ordinary course of business.[8]

## Style 200

With regard to the costing of style 200, the record demonstrates that the suede (leather) was purchased by Fortune from a Japanese firm at a cost of $0.55 (U.S.) per square foot plus $0.02 (U.S.) per square foot delivery and transportation charges.[9] Fortune kept a running inventory on the suede used in these jackets and had some stock on hand before the order for style 200 was signed. Fortune bought the suede in lots of 100,000 or 500,000 square feet which were composed of skins having an average width of 6 to 8 feet. While the actual cost of the suede leather for an individual jacket depended on the size of the garment, an average of 29 square feet was used at a cost of $16.53 (U.S.) per jacket.

In addition to the suede, there was a charge for "[l]eather for trimming" which covered the cost of the leather piping and the leather buttons. The leather used for piping and buttons was purchased in Hong Kong at a cost of $1.68 (U.S.) per foot and was specially dyed to match the wool portions of style 200.

The manufacturing steps involved in completing the jacket included cutting and sewing the leather parts together, sewing the trim, sewing in the lining, contrast stitching, and pressing. The cutting charges included cutting the suede, the lining and the interlining. The interlining was neither wool nor leather. The sewing charges included the contrast stitching and sewing the piping when the garment was sewed together. The pressing charges represented two pressings; one before cutting and one when the garment was finished.

---

[7] The record shows that the prices for the materials in question did not vary in 1973.

[8] Citing 4 *Wigmore on Evidence* (3d ed. 1940) § 1230, pp. 434–35, defendant claims that actual documents recording the various costs should have been produced rather than testimony or a summary of their contents. It is noted, however, that with regard to voluminous documents, 4 *Wigmore on Evidence* (Chadbourn rev. 1972) § 1230, pp. 535–41 indicates that the convenience of trials demands that summaries of complicated, burdensome or voluminous original records prepared by competent individuals be offered in evidence as the only practicable way of recieving such proof. The most commonly recognized application of the principle stated above is that by which business transactions are allowed to be shown by schedule or summary. See also *Henry A. Wess, Inc.* v. *United States*, 68 Cust. Ct. 201, 203, C.D. 4361 (1972) which held that statements as to costs by a businessman who directly supervises and controls the company records can be received into evidence without requiring substantiation of his statements through the submission of his official records.

[9] The suede was valued in U.S. dollars since all Fortune's purchases from Japan were computed in U.S. dollars. For the sake of clarity (U.S.) appears after the numerals to denote U.S. dollars and (H.K.) appears after the numerals to denote Hong Kong dollars. In the period involved here—1973—a Hong Kong dollar was valued at $0.20 per U.S. dollar.

The shell portion of the suit was made of a flat hand-knit wool purchased from Japan at $1.80 (U.S.) per shell. The knitting charges were $1.20 (H.K.) per shell; loopwork charges, representing work done around the armhole of the shell, were $0.70 (H.K.) per shell; an average mending charge of $0.20 (H.K.) was included for every shell (even though not every shell required mending); there was a pressing charge of $0.25 (H.K.) after knitting and a drycleaning charge of $0.30 (H.K.) after the shell was completed.

The wool yarn used for the pants was also purchased by Fortune in Japan and came to $5.40 (U.S.) per pair (including dyeing and delivery charges). The pants were made of a machine circular knit at a knitting charge of $1.80 (H.K.) per pair. The cutting charges were $0.25 (H.K.) representing the per piece charge for labor. An average mending charge of $0.30 (H.K.) was entered as were pressing charges of $0.60 (H.K.) for pressing the yarn after it was made into piece goods and pressing the pants after completion.

In Summary, Chen's testimony and plaintiff's exhibit 7 indicate the following breakdown of the U.S. dollar costs properly included in a chief value computation for style 200:

| Leather | | Wool | | |
|---|---|---|---|---|
| suede | $16. 53 | Shell: | wool yarn [10] (includes dyeing) | $1. 80 |
| leather trimming (including leather on buttons) | 1. 68 | | knitting charges | . 24 |
| suede cutting charges | . 36 | | | $2. 04 |
| pressing charges (before cutting) | . 10 | | | |
| | | Pants: | wool yarn (includes dyeing) | $5. 40 |
| | | | knitting charges | . 36 |
| | | | pressing charges (when yarn made into piece goods) | . 06 |
| | | | cutting charges | . 05 |
| | | | | $5. 87 |
| total: | $18. 67 | total: | | $7. 91 |

[10] According to Chen, the wool yarn, as indicated in plaintiff's exhibit 7, cost $3.60 (U.S.) per pound with ½ pound of wool used for each shell and 1-½ pounds used for each pair of pants. Chen further testified that

In computing the value of the leather, the cost of: the suede, the leather trimmings, the leather portion of the buttons, the pressing charges before cutting the suede, and the suede cutting charges were included. With regard to the cutting charges, plaintiff's exhibit 7 shows a figure of $5.50 (H.K.), i.e., $1.10 (U.S.). However, this charge includes the cutting not only of the suede but of the non-leather lining and interlining. Since the lining and interlining are neither leather nor wool, this entire charge cannot be attributed to the leather cost. In this circumstance, plaintiff has allocated one third of the total cutting cost, i.e., $0.36 (U.S.) to the cost of cutting the suede. The allocation of processing costs among component materials is permissible in determining component material of chief value. *N. Erlanger Blumgart Co., Inc.* v. *United States*, 62 Cust. Ct. 110, 114, C.D. 3691, 295 F. Supp. 278 (1969), *aff'd* 57 CCPA 127, C.A.D. 991 (1970). And in the present case one third appears to be a reasonable allocation, particularly in view of Chen's testimony that cutting the lining and the interlining was cheaper than cutting the suede.[11]

While the charges for pressing the suede before cutting are included in the cost of the leather, the charges for pressing after the jacket has been assembled do not figure in the chief value computation. Accordingly, one half of the pressing charges have been included in the computation for the value of the leather.

It is to be noted that the lining, interlining, and non-leather part of the buttons are not included in the chief value computation since they are neither wool nor leather. Similarly, the button sewing charges are not included since those charges are part of the final assembly process.

Nor are the sewing expenses incurred in completing the jacket, pants and shells includible in the chief value computation since they are expenses necessary to the assembly of the completed three-piece suit. See e.g., *United States* v. *Bernard, Judae & Co.*, 15 Ct. Cust. Appls. 172, T. D. 42231 (1927) where the cost of inserting bristles

---

the undyed charge for this wool as purchased from Japan was about $3.50 (U.S.) per pound and the dyeing charge was $0.30 (H.K.) per pound. Defendant contends that these figures demonstrate a cost discrepancy and show that the dyed wool "in actuality cost $3.80 rather than $3.60 per lb." (Br. p. 69.) The difficulty with this contention is that the cost of the wool, i.e., $3.50 per pound, was expressed by Chen in *U.S.* dollars, whereas the dyeing charge, i.e., $0.30 per pound, was expressed by him in *Hong Kong* dollars. When it is considered (i) that the dyeing charge when translated into U.S. dollars was 6 cents per pound (since a Hong Kong dollar at that time equalled 20 cents (U.S.)); and (ii) that Chen approximated the charge for the undyed wool at "about $3.50" per pound (R. 168), the cost of $3.60 per pound (U.S.) as indicated by Chen is, under the circumstances, sufficiently close to the actual cost of $3.56 (U.S.) as to be within reason.

[11] With regard to the suede and wool portions of the imported sets, defendant argues that the evidence is conclusory because it is based on average amounts rather than a piece by piece breakdown. Defendant is apparently contending that a separate cost figure for each individual garment is necessary to establish chief value. However, in cases such as these, costing based upon averages is a reasonable way of determining what a manufacturer should charge for a garment, particularly when a major part of the garment is made from animal skins which by their very nature are irregular in size and quality and the average cost per garment is not based upon estimates or approximations, but on the actual expenses incurred by Fortune in the manufacture of the component parts of the merchandise before the court. See, e.g., *N. Erlanger Blumgart Co., Inc.* v. *United States, supra,* 62 Cust. Ct. 114; *Field & Co.,* v. *United States,* 7 Ct. Cust. Appls. 332, 336–37, T.D. 36876 (1916); *True Fit Waterproof Co.* v. *United States,* 7 Ct. Cust. Appls. 489, 492–93, T.D. 37107 (1917).

into the celluloid handles of brushes represented labor upon the brush and not upon a material, and the cost thereof was not permitted to be added to the bristles for the purpose of determining the component material of chief value. By the same token, the foregoing sewing expenses did not advance the value of the materials as materials and the charges therefor are not considered in determining the component material of chief value. In this connection, the distinction between costs attributable to component materials as opposed to those attributable to the article itself is clearly delineated in *Swiss Manufactures Association, Inc.* v. *United States, supra,* 39 Cust. Ct. at 233–34, as follows:

> What must be kept in mind in the distinction between manufacturing operations which advance the materials *as materials* and manufacturing operations which convert the materials into the complete articles. The law is well settled that the costs entering into bringing the materials to the state where they are ready to be united with the other materials in the manufacture of the article are attributable to the *materials* and are to be considered in the determination of component material of chief value, but the costs entering into the uniting of the materials to make the finished article are not to be considered in the determination of component material of chief value. *Turner & Co. et al.* v. *United States,* 12 Ct. Cust. Appls. 48, T. D. 39997; *C. H. Powell Co. et al.* v. *United States,* 64 Treas. Dec. 467, T.D. 46711. [Emphasis in original.]
>
> * * * * * * *
>
> * * * the values of the single or separate component materials must be taken as of the time each one is ready to be united with the other materials in the manufacture of the article. * * *

In light of the foregoing, we find the value of the leather, including both material and processing costs, is $18.67.

The shell and pants of style 200 are both of wool. The value of the wool includes the cost of the wool yarn, and the knitting charges. The sewing, looping, mending and drycleaning charges are not included, since those charges do not constitute processing of the wool material, but rather were for finishing the shell and/or pants, or were performed after the articles were complete.

The sewing work on the shell (which, as previously noted, is hand-knit) was performed to put in the zipper, while the sewing work on the pants was done to join the various knit piece goods which form the pants. The looping charges were incurred in finishing the armhole of the shell, while the mending and drycleaning charges were for work performed after the shell and pants had been completed. None of the charges for the foregoing work is includible in determining component

material of chief value since the work involved did not advance the materials as materials.

The pressing charges for the pants represent two separate pressing operations, one which takes place after the wool yarn is made into piece goods, while the other is performed after the pants are completed. Since only the first pressing affects the wool as a material, it is reasonable to allocate one-half of the total pressing charge or $0.06 (U.S.) for the pants in computing the value of the wool material.

The cutting charges for the pants are included in chief value since this is work performed on the material itself.

Neither the zipper material in the shell and pants nor the elastic waistband in the pants is made of wool or leather and hence is not considered.

In sum, the total value of the wool in the shell and pants—which value includes the material and processing costs—totals $7.91. Since, as previously indicated, the total value of the leather is $18.67, the necessary conclusion is that style 200 is in chief value of leather, as claimed by plaintiff.

## Style 7205

The testimony of the witness Chen as to style 7205 indicated that each jacket required 12 square feet of lamb-suede when averaged out over a large number of garments and that the cost of the suede was $0.75 (U.S.) per square foot (which included a freight charge of $0.05 (U.S.)) or a total cost per jacket of $9.00 (U.S.). The suede was purchased in the United States where it was bought by the skin, the average width of which was between 4 to 6 feet. According to Chen, although the two panels on the front of the jacket are only 6 inches wide, they cannot be cut out of one width of lambskin despite the fact that the lambskin can be cut lengthwise or crosswise. Chen testified that the cutting charge for the suede in the jacket was $3.50 (H.K.) or $0.70 (U.S.). The interlining on the jacket was either cotton or polyester, while the knitting was of a circular machine type which cost $0.58 (H.K.) per pound. Chen further testified that sewing charges of $1.50 (U.S.) were incurred for: sewing the suede to make the panels; sewing buttonholes; and sewing the jacket together. As in the case of style 200, he stated that there were two separate pressings, the first before cutting, the second after the jacket was finished.

With regard to style 7205, plaintiff contends that Mr. Chen's testimony and plaintiff's exhibit 7 indicate the following breakdown of those U.S. dollar costs which are properly considered in a chief value analysis of that style:

| Leather | | | Wool | | |
|---|---|---|---|---|---|
| Sheep-suede material | $9.00 | | Jacket: | wool yarn | $1.80 |
| | | | | cutting charges | .04 |
| cutting charge for | | | | knitting charges | .12 |
| suede parts | .70 | | | pressing charges | .02 |
| | | | | | $1.98 |
| pressing charges | .06 | | | | |
| | | | Shell: | (same as style 200) | 2.04 |
| charge for sewing suede parts together | .60 | | | | |
| | | | Pants: | (same as atyle 200) | 5.87 |
| total: | $10.36 | | | total: | $9.89 |

Chen testified that the value of the leather in the jacket component of style 7205 includes the value of the lambsuede, the charges for cutting the suede and pressing it prior to cutting, and the charges for sewing the suede pieces together to make panels which were joined with the wool to produce the jacket. The figures he presented show that Fortune allocated the various processing and finishing costs incurred in producing the jacket between leather and wool on an 80–20 percent basis, with 80 percent for leather and 20 percent for wool.

Plaintiff contends that since the sewing charges for the jacket include sewing the jacket together as well as sewing the suede pieces together to make the panels, an allocation of the charges of sewing the suede must be made. Citing *Swiss Manufactures Association, Inc. v. United States, supra,* 39 Cust. Ct. at 234, plaintiff states that the joining of the leather pieces together is properly part of the value of the leather component material since until the panels are created, the leather is not ready to be united with the wool to form the jacket. With regard to the balance of the sewing charges for sewing the jacket together (i.e., sewing the leather panels and wool pieces together), plaintiff claims these are clearly assembly charges and, therefore, not part of the chief value computation. On this aspect plaintiff further contends that the sewing charges should be allocated on the basis of 80 percent to the leather part of the jacket and 20 percent to the woolen part. It then asserts that if this 80 percent is further allocated between (1) the sewing necessary to make the suede panels and (2) the sewing of the leather panels and wool pieces together, 40 percent or $0.60

(U.S.) of the total jacket sewing charge of $1.50 (U.S.) is attributable to preparing the suede panels.[12]

It is in these contentions that plaintiff has failed in its attempt to prove that the component material of chief value in style 7205 was leather. For while it is clear

> \* \* \* that the value of the materials should be determined as of the time when they had reached such a condition that nothing remained to be done upon them by the manufacturer except putting them together, there still remains open in each case that may arise the determination of the question as to whether or not that stage has or has not been reached, and this is the precise issue here. [*United States* v. *Meadows*, 2 Ct. Cust. Appls. 143, 146, T.D. 31665 (1911).]

With this consideration in mind, plaintiff claims the suede panels are not ready to be united with the wool to form the jacket until such time as the suede pieces are sewn together. In this circumstance, the $0.60 (U.S.) sewing charge which plaintiff would add to the value of the suede leather for sewing such pieces together is of major importance in determining the component material of chief value for without this charge the total cost of the leather would be $9.76 rather than plaintiff's claimed value of $10.36 and thus the wool which is valued by plaintiff at $9.89 would be the component material of chief value.

There is some difficulty in determining when materials have reached a condition where nothing remains to be done by the manufacturer except putting them together. Here we are concerned with three-piece pant suits composed of a jacket, a shell, and a pair of slacks. In computing the component values of *style 200* the component materials were considered by plaintiff to be ready to be united to form the three-piece unit when the woolen and leather portions were fully processed and cut and were ready to be sewn or assembled into the respective jacket, slacks and shell which comprised the three-piece suit. Thus, in the case of style 200 there were no sewing charges included for the leather jacket such as charges for sewing the pieces of suede together to make the pockets, the leather collar and the leather tabs. Similarly, there were no sewing charges for sewing the woolen portions of the style 200 outfit together, such as joining the various knit piece goods which formed the slacks and the shell.[13]

In the case of style 7205, however, plaintiff adopts a different approach. Thus, in contrast to style 200, it includes the charge of $0.60 (U.S.) for sewing the suede pieces together but totally ignores the

---

[12] There is no indication or explanation as to how plaintiff arrived at this 40 percent figure nor is there any evidence in the record to support it.

[13] Had these sewing charges been included for both the leather and woolen portions of style 200, the record indicates that the value of the leather vis-a-vis the value of wool would have been even larger than that actually claimed.

charges for sewing the woolen pieces together, such as sewing together the various pieces of wool to make the collar, the front and back of the jacket, and the sleeves. Had plaintiff made a computation for style 7205 consistent with its style 200 computation, it would *not* have included the amount of $0.60 for sewing the suede pieces together—this on the basis that it considered the component materials for style 200 as fully processed and cut when they were ready to be united to form the woolen and leather portions. However, if the $0.60 charge is properly includible in determining the value of the leather in style 7205 then it was incumbent upon plaintiff also to include the charges for sewing together the *wool* pieces of that suit so that a proper comparison could be made between the total value of the leather and the wool portions of the suit. In other words, by including in style 7205 the sewing charges for the suede pieces, while at the same time ignoring the sewing charges for the *woolen* pieces, plaintiff would have it both ways. And this the court cannot permit.

In sum, we must conclude that the $0.60 sewing charge is not part of the value of the leather material of style 7205. We therefore hold that the value of the leather material for style 7205 is $9.76 ($10.36 less $0.60) while the value for the woolen material is $9.89. Accordingly, the component material of chief value of style 7205 as an entirety is wool.

In view of the foregoing, plaintiff's claim with regard to style 200 is sustained, but with regard to style 7205 is overruled. Judgment will be entered accordingly.