(C.D. 4735)

RENE D. LYON CO., INC. *v.* UNITED STATES

---

[14] In the recent case of *Arnold Pickle & Olive Co.* v. *United States*, 79 Cust. Ct. 50, 52, C.D. 4712, 435 F. Supp. 921, 922 (1977), the court specifically found the government's appraisement to be wrong, and stated that "it could not be correct to estop [the parties] from litigating an issue which was not resolved in the first case—the correct value of the imported merchandise."

■■■■■■■

■■■■■■■

Court No. 71-8-00721

■■■■■■

■■■■■■

(Decided February 6, 1978)

*Serko & Simon (Gerald B. Horn, Carl R. Soller,* and *Margaret Hardy Sachter* of counsel) for the plaintiff.

*Barbara Allen Babcock,* Assistant Attorney General (*Saul Davis* and *Mark K. Neville, Jr.,* trial attorneys), for the defendant.

MALETZ, Judge: This case involves the proper tariff classification of merchandise consisting of assorted miniature animal figures invoiced as "Holiday Animal Assortment" (Item No. 1215), "Night before X'mas Red Mouse Doll" (Item No. 2111), and "Assortment of Animals" (Item No. 2112). The articles which were imported from Japan via the port of New York in 1970 were classified by the government under item 737.40 of the Tariff Schedules of the United States, as modified by T.D. 68-9, as other toy figures of animate objects, not stuffed, and assessed duty at the rate of 24% ad valorem.

Plaintiff claims that the imported articles are properly classifiable under item 772.97, as modified by T.D. 68-9, as other Christmas ornaments of rubber or plastics, dutiable at the rate of 11.5% ad valorem. Alternatively, plaintiff claims classification under item 774.60, as modified by T.D. 68-9, as other articles of rubber or plastics, not specially provided for, which are also dutiable at the rate of 11.5% ad valorem.

The pertinent provisions of the tariff schedules read as follows:

Classified under:

Subpart E [Schedule 7, Part 5] headnotes:

> 1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * * —
>
>    *    *    *    *    *    *    *
>
> 2. For the purposes of the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults.
>
>    *    *    *    *    *    *    *

Toy figures of animate objects (except dolls):

Not having a spring mechanism:

\* \* \* \* \* \* \*

Not stuffed:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 737.40 | Other_____ | 24% ad val. |

Classification claimed by plaintiff:

Subpart C [Schedule 7, Part 12]:

\* \* \* Christmas ornaments; \* \* \*; all the foregoing \* \* \* of rubber or plastics:

| | | |
|---|---|---|
| 772.95 | Christmas tree ornaments_____ | \* \* \* |
| 772.97 | Other_____ | 11.5% ad val. |

Alternative classification claimed by plaintiff:

Subpart D [Schedule 7, Part 12]:

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 774.60 | Other_____ | 11.5% ad val. |

We consider first the legal principles applicable here. And on this aspect, it is basic that there is a presumption of correctness attendant upon the classification of the imported articles under item 737.40 as toy figures of animate objects. This presumption, of course, attaches to each subsidiary fact necessary to support that conclusion. In this circumstance, plaintiff has the twofold burden of establishing that the presumptively correct classification of the imported articles as toy figures was in error and that the articles are properly classifiable either under item 772.97 as other Christmas ornaments in chief value of rubber or plastics or alternatively under item 774.60 as articles not specially provided for in chief value of rubber or plastics. Thus, to prevail on its principal claim, it was incumbent upon plaintiff to prove that the importations were not chiefly used for the amusement of children or adults [1] but rather were chiefly used for Christmas ornaments and were in chief value of rubber or plastics.[2] To prevail on its alternative claim, plaintiff has the burden of establishing that the importations were not chiefly used for the amusement of children or adults, were not chiefly used for Christmas ornaments, and were in chief value of rubber or plastics.

---

[1] An object is one of amusement under the tariff schedules if its "purpose \* \* \* is to give the same kind of enjoyment as playthings give, \* \* \* whether the object is to be manually manipulated, used in a game, or \* \* \* worn." *United States* v. *Topps Chewing Gum, Inc.*, 58 CCPA 157, 159, C.A.D. 1022, 440 F. 2d 1384, 1385 (1971).

[2] In this connection, it has been consistently held that articles chiefly used for ornamental purposes are outside the scope of the toy provisions. See, e.g., *Amico, Inc.* v. *United States*, 73 Cust. Ct. 150, 152, C.D. 4566 (1974).

In order to establish its claims, plaintiff called two witnesses [3] and introduced in evidence three representative samples from the six animal figures invoiced as the "Holiday Animal Assortment" (Item No. 1215) consisting of a mouse, a squirrel and an elephant (plaintiff's exhibit 1). Plaintiff also introduced in evidence its 1970 catalogue (plaintiff's exhibit 2).[4]

Examination of the samples shows that the mouse is approximately 3″ in height, is dressed in a red felt jacket with a green felt collar, and is composed of two egg-shaped styrofoam configurations flocked with purple rayon fibers. The feet, ears, arms, hands and tail are of purple or white textile material, with all but the ears reinforced with wire to hold their shape. The feet are considerably oversized and are reinforced by wire in such a way as to enable the figure to be free standing. The eyes and nose are of plastic as is a banjo which is affixed to the figure. A gold-colored nylon string formed into a loop is attached behind one ear.

The squirrel is about 3½″ high, is dressed in a light green felt jacket with a darker green felt collar, and is composed of two egg-shaped styrofoam configurations flocked with red rayon fibers. The feet, eyes, ears, arms, hands and tail are of red or white textile material, with the feet, arms and hands reinforced with wire to hold their shape. Like the mouse, the feet of the squirrel figure are considerably oversized and are reinforced by wire in such a way as to enable the figure to be free standing. The squirrel has a white flannel stripe down the facial portion which ends at a plastic button nose. A gold-colored nylon string formed into a loop is attached at the top of the head.

The elephant is about 4½″ high, is dressed in a pink felt jacket with a white felt collar and has a matching pink felt conical hat with a white pompon on top. The figure is composed of two egg-shaped styrofoam configurations flocked with bright green rayon fibers. The feet, ears, trunk, arms, hands and tail are of gray or white textile material, with all but the ears reinforced with wire to hold their shape. Like the other two figures, the feet are considerably oversized and are reinforced in such a way as to enable the figure to be free standing. The eyes are of a plastic material and a gold-colored nylon string formed into a loop is attached through the hat.

The "Night before X'mas Red Mouse Doll" (Item No. 2111) is depicted in the catalogue as a figure of an animated mouse, 6½″ high, red and white in color and comical in appearance. Finally, the "Assortment of Animals" (Item No. 2112) consists, according to the catalogue, of a dozen animal figures which are similar to the "Holiday

[3] The two witnesses called by plaintiff were Martin Halpern, plaintiff's import manager, and John Adams, plaintiff's national sales manager.
[4] Defendant did not present any evidence.

Animal Assortment" figures and come in four styles, i.e., a "Blue Dog," "Red Squirrel," "Yellow Lion", and "White Cat."

To support its contention that the imported animal figures were chiefly used as Christmas ornaments, plaintiff called John Adams, its national sales manager as a witness. Mr. Adams testified that plaintiff sells figures such as those involved here to all types of retail stores, florists, department stores and such toy stores as have Christmas departments. He said that the figures are sold by plaintiff's salesmen through the use of the company's catalogue and through trade shows such as gift shows, variety merchandise shows, international toy and decor shows and premium shows. Mr. Adams further testified that larger department stores have different buyers for different departments and that at those stores plaintiff's salesmen sell the figures to the trim and tree buyers and not to the toy buyers. He added that in the smaller stores the buyer "crosses over" and buys many different lines of merchandise. The witness could not state what percentage of figures was sold to stores that had separate and distinct Christmas departments and Christmas buyers.

With regard to the plaintiff's 1970 catalogue, Mr. Adams pointed out that Item 1215 (i.e., the "Holiday Animal Assortment") appears on a page in which only Christmas ornaments and decorations are depicted, while the other two items in issue, i.e., Items 2111 and 2112, are shown on a page of the catalogue which covers electric Christmas trees, light sets, reindeer, Santas, and other figures.

Mr. Adams indicated that while he did not use the imported figures on his own Christmas trees, he used similar animal figures. He further stated that while the figures such as those in issue are specifically used as Christmas tree ornaments, they can be placed on mantels, used over fireplaces, and put in wreaths and other decorative places in the home to add to the Christmas spirit. According to Mr. Adams, animal figures of this kind lend a fantasy and fairyland atmosphere which adds to the Christmas spirit and are used in the sense of "enhancing any Christmas decoration." The witness said that he has seen "animal items" used by neighbors and friends on Christmas trees but has never seen children play with them. He could not remember if his observations as to such use occurred in 1970.

As for the samples in evidence, Mr. Adams testified that the imported animal figures themselves do not have a specific Christmas connotation and indicated that all of the importations had a comical aspect to them. He stated that if he saw the articles in toy stores or a toy department, he would think they were toys for small children. In fact, he stated, the only basis for designating the article as a Christmas article rather than a toy is the department in which it is sold and the loop or string on it. In his opinion the string would have no pur-

pose if the article were a toy. He further indicated that if a person took a toy home, put a string on it and hung it on a Christmas tree, it would be a Christmas ornament or decoration.

Lastly, Mr. Adams testified that he had no way of knowing whether a purchaser used an imported figure in his home as a Christmas decoration; however, he expressed the opinion that if the figure was bought in a Christmas decoration section, the purchaser would use it for a decorative purpose.

As additional support for its contention that the imported animal figures were chiefly used as Christmas ornaments, plaintiff also places emphasis on the testimony of Martin Halpern, its import manager, that the imports in question were sold primarily in florist shops, Christmas shops, gift shops, etc. When asked whether or not the merchandise was sold in toy stores, Mr. Halpern testified that while plaintiff may have certain toy customers, it sells primarily to Christmas departments. He went on to say that in stores having both toy departments and trim and tree departments, plaintiff would sell to the trim and tree department.

Against this background, the essence of plaintiff's case is (1) that since the imported figures were not generally sold to toy stores but rather to stores and departments of stores handling Christmas decorations; and (2) that since the figures appeared in plaintiff's catalogue at pages covering Christmas decorations or ornaments, the imported figures are *ipso facto* classifiable as Christmas decorations or ornaments rather than as toys. In short, the basic underpinning for plaintiff's case is the manner in which the imports were merchandised. The difficulty with this, however, is that "[w]hile the manner in which an article is merchandised is one of the factors to be considered in determining its classification, it is not determinative." *Russ Berrie & Co., Inc.* v. *United States*, 76 Cust. Ct. 218, 226, C.D. 4659, 417 F. Supp. 1035, *appeal dismissed*, 63 CCPA 125 (1976). As the appellate court stated in *United States* v. *Ignaz Strauss & Co., Inc.*, 37 CCPA 32, 35–36, C.A.D. 415 (1949): "Neither is reliance upon the merchandising medium through which articles may be sold always a proper criterion through which to judge their classification. It would seem that under present day mercantile practices almost everything salable is sold by almost every merchant." These considerations are equally applicable here where the record indicates that the various stores which purchased the imported articles from plaintiff displayed and sold many different types of merchandise, including Christmas decorations, toys, etc.

Also militating against plaintiff's contention that the imported figures are chiefly used as Christmas ornaments are the samples themselves. For the samples admittedly have no inherent Christmas connotation and are comical in appearance. Indeed, an examination of

the samples indicates, that the animals which are given human attributes through dress and posture appear to be well suited to create amusement. Thus, plaintiff's main witness Adams testified that if he saw the articles in a toy store, he would think they were toys for small children. In fact, he conceded that the only basis for considering that the figures were Christmas articles rather than toys is the department in which they were sold and the fact that they had a string or loop on them. The illogical nature of this conclusion is demonstrated by the witness' further testimony that if a person took a toy home, put a string on it and hung it on a Christmas tree, the article would be a Christmas ornament or decoration.

The crux of the matter is that plaintiff's proof falls far short of that necessary to establish that the imported figures were chiefly used as Christmas ornaments. In other words, plaintiff has failed to overcome the presumption of correctness attendant upon the classification of the imported articles under item 737.40 as toy figures of animate objects.

But even assuming *arguendo* that the plaintiff has shown that the importations were not chiefly used for the amusement of children or adults and thus were not toy figures, it still would not have sustained its burden because it has not proven that the articles are in chief value of plastics—proof of which is crucial to both of its alternative claims.

What proof is necessary to establish the component material of chief value was set out recently in *J. C. Penney Purchasing Corporation* v. *United States*, 77 Cust. Ct. 48, 58, C.D. 4671 (1976) as follows:

> Inasmuch as General Headnotes and Rules of Interpretation, headnote 9(f)(i) states that the term "of" when used between the description of an article and a material means that the article is wholly or in chief value of the named material, it was plaintiff's burden, in order to establish its claim under item 791.75, to prove * * * the component material of chief value * * *.

> The proper method of determining the chief value of these importations is to ascertain the costs of the separate component materials at the time when they have reached the state when nothing further need be done to them except combine them into the completed article. * * *

> In computing the component material of chief value, labor performed on the individual component materials prior to combination into the completed article is considered as part of the component's value. * * * Further, the costs of any processing done on component materials to permit their uniting with other materials in manufacturing an article are attributable to the material and must be considered in determining the component material of chief value. However, costs incurred in uniting the materials into the finished article are not considered in the chief value computation. * * *

With these considerations in mind, plaintiff has made no attempt to establish the costs of the individual components of the importations at the time they were ready to be combined into the finished article. In lieu of such evidence, it presented the testimony of its import manager, Martin Halpern, whose duties included negotiating price, delivery, quality and packing with the Japanese manufacturer of the articles. Mr. Halpern stated that while it was his responsibility to make determinations as to the chief value of plaintiff's importations for duty purposes, he did not know the exact cost of the materials used in the manufacture of the importations. However, even though he never purchased any of the materials himself in Japan, he stated that he was aware of the relative costs of such materials in Japan in 1970. He then testified that the imported figures were in chief value of plastics. He added that he was able to determine this by "looking at the item and feeling it."

Mr. Halpern testified that he believed that the styrofoam (a plastic material) contained in the importations was more expensive than the textile material. This belief was predicated on his experience and expertise in the Japanese market. However, Mr. Halpern did not know when the manufacturer purchased the component materials that went into the imported merchandise or when the imported merchandise was finally assembled ready for shipment.

Mr. Halpern did not know the cost of any of the components of the imported merchandise immediately prior to joinder into the finished article, nor did he know the cost of labor to the manufacturer in getting the various components of the imported merchandise in condition ready for assembly into the finished article. Halpern stated that he could *estimate* the cost of labor based on his experience in manufacturing corsages, *prior to 1959*. These labor costs were estimated at 10% which, according to the witness, was a manufacturer's "rule of thumb."

The witness also testified as to various percentages of what he believed the relative costs of the flannel and styrofoam should be although he admitted he did not know the exact cost figures. Regarding the percentage cost figure for the styrofoam, he first stated it was based on the total cost of the article to plaintiff but later retracted that statement and contended that the figure was based on a paper the manufacturer had sent to him. He was not sure but believed this paper referred to cost percentages for 1976 and not 1970.

From the above, it is clear that plaintiff has not established a *prima facie* showing of component material of chief value within the guidelines quoted above from *Penney*. However, plaintiff points out that proof of the costs of each component need not be presented where the most casual examination of the sample shows that only one material can be the component of chief value (*John S. Connor*,

*Inc.* v. *United States*, 54 Cust. Ct. 213, C.D. 2536 (1965)) or where a *prima facie* showing is made by a broad conclusory statement of a witness who should know (*Chas. Kurz Co.* v. *United States*, 57 Cust. Ct. 73, C.D. 2733 (1966)).

We first consider whether or not a casual examination of the samples shows that only plastic can be their component material of chief value. Such examination reveals the following: (1) the mouse consists of a head, body, eyes, nose and musical instrument of plastic, while the flocking, feet, ears, arms, hand, tail, jacket and collar are of textile material, and the feet, tail, arms and hands are reinforced with metal wire; (2) the squirrel consists of a head, body and nose of plastic, while the flocking, feet, eyes, ears, arms, hands, tail, jacket and collar are of textile material, and the feet, arms and hands are reinforced with metal wire; and (3) the elephant consists of a head, body and eyes of plastic, while the hat, flocking, feet, ears, trunk, arms, hands, tail, jacket and collar, are of textile material, and the feet, trunk, arms, hands and tail are reinforced with metal wire. The strings attached to each animal figure are made of nylon.

The textile material in the figures must be cut to size, shaped and placed on the styrofoam body. There are labor charges for each of the textile components, whereas there was manifestly no labor cost, prior to assembly, for the styrofoam.

In short, an examination of the samples discloses that either the plastic, the textile material or the metal wire can be the component material of chief value of the imported merchandise. Under these circumstances, an examination of the samples scarcely demonstrates that plastic is the component material of chief value.

With regard to the second exception regarding conclusory statements of the component materials by a witness who should know the costs thereof, the cross-examination of Mr. Halpern showed that he was totally unqualified to testify as to such costs. As we have seen, Mr. Halpern did not know the cost of any of the components of the imported merchandise immediately prior to joinder into the finished article, nor did he know the cost of labor to the manufacturer in getting the various components of the imported merchandise in condition ready for assembly into the finished article. And although he stated that he was charged with the duty of knowing the chief value of his company's imports, there was nothing in his testimony which persuaded the court that he did know such values. With regard to labor, Halpern *estimated* this at a blanket 10% on each component based on his manufacturing experience *prior to 1959*. In this connection the proper method that must be used in computing component material of chief value is the cost to the manufacturer at the *time* of assembly and *estimates* and *ratios* are insufficient for fulfilling this

burden. *United States* v. *H. A. Caesar & Co.*, 32 CCPA 142, 143–44, C.A.D. 299 (1945).

In the *Kurz* case, *supra,* the court accepted the broad conclusory statements of a witness as establishing a *prima facie* showing on the issue of component material of chief value under circumstances where such component material appeared fairly obvious from the sample, the witness was in a position to know such values, and there was no cross-examination to show that the witness' statements were not based on facts. None of these elements are present here.

In conclusion, the court holds (1) that plaintiff has failed to overcome the presumption of correctness attendant upon the government's classification of the imported figures under item 737.40 as toy figures of animate objects; and (2) that plaintiff has failed to prove that the component material of chief value of the importations in question was rubber or plastics. The action is therefore dismissed and judgment will be entered accordingly.